## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LORILLARD TOBACCO COMPANY, | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 4753 |
| | ) | |
| v. | ) | Judge Joan Gottschall |
| | ) | |
| ELSTON SELF SERVICE WHOLESALE, | ) | Magistrate Judge |
| GROCERIES, INC., *et al.*, | ) | Martin C. Ashman |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a motion by Plaintiff, Lorillard Tobacco Company, Inc. ("Lorillard"),

asking the Court to strike the report of Frank Wirth, an expert witness retained by Defendants,

Elston Self Service Wholesale Groceries, Inc., *et al.* ("Elston"). The Court has jurisdiction over

this motion under Judge Gottschall's referral of the case for discovery supervision pursuant to

Local Rule 72.1. For the reasons that follow, Lorillard's motion is granted in part and denied in

part.

### I. Background

Lorillard Tobacco Company is the fourth-largest tobacco company in the United States,[1]

manufacturing a variety of "premium" brand-name cigarettes, including Newport, "the leading

---

[1]Or was at the time the Amended Complaint was filed; three and a half years have
elapsed, and Lorillard's market position may have changed.

brand of menthol cigarettes sold in the United States." (Amended Compl., ¶ 9.) Elston is a

cigarette and grocery wholesale business. (*Id.*, ¶ 18.) The main allegation in Lorillard's

complaint against Elston and its co-defendants is that they willfully purchased and resold

counterfeit cigarettes masquerading as authentic Newports at artificially low prices, damaging

Lorillard in the process. Because willfulness is an element of Lorillard's claim, the subjective

mental state of the defendants—their knowledge that the cigarettes they were purchasing were

fakes—is a material fact at issue in the case.

In order to support its position that it did not know the cigarettes were counterfeits, Elston

retained Frank Wirth as an "expert in the cigarette marketing industry." (Defs.' Resp. at 2.)

Wirth's key qualification as a cigarette marketing expert is his employment history, which

includes six years (1984-1990) as a Group Product Manager for Southland Corporation and one

year (2002) as General Sales Manager of Fleming Corporation. At Southland Corporation, the

parent company of a national convenience store chain, Wirth had "management responsibilities

for . . . Core Categories, which included 1.2 billion dollars in cigarette sales." (*Id.* at 3.) At

Fleming, Wirth worked directly for a cigarette wholesaler, managing a staff of five to seven

salespeople and handling more than 150 accounts. (*Id.*)

The substance of Wirth's report can be divided into three categories. At the beginning of

his report, Wirth recounts his qualifications and proceeds to describe certain practices, such as

giving deep discounts to large-quantity customers or giving other "wholesale allowances" to

large-volume buyers, that he claims are common in the cigarette industry. (Wirth Report at 1-2.)

Wirth also describes how, in his experience, "fourth tier" cigarette suppliers would sometimes

sell premium cigarettes at cost and "make up the margin on the fourth tier cigarette and tobacco

products that they sold in as part of their total program." (*Id.* at 2-3.) Finally, Wirth discusses

what he claims is a prevailing norm of confidentiality in the industry regarding wholesale

allowances and cost information. (*Id.* at 3.) The common denominator of this testimony is that it

relates to general customs or practices in the industry and is based on Wirth's personal

observations and experience. Wirth then goes on to briefly describe Elston's cigarette purchasing

history based on his review of documents already disclosed in this case. This portion of Wirth's

testimony discusses the price per carton that Elston was paying for Newport and other premium

cigarettes in 2002 and 2003, the relevant time period in this case. The third phase of Wirth's

testimony is his conclusion, based on his "expert opinion," that the $2.80 per carton difference in

price between the counterfeit and legitimate Newports "was not significant enough to trigger a

red flag that the cartons in question were not sold through an intermediate supplier direct from

Lorillard the manufacturer." (*Id.* at 5.) In other words, Wirth's conclusion is that Elston would

not have suspected, based on the price difference, that it was being offered counterfeit cigarettes.

Lorillard argues that the report should be stricken in its entirety. First, Lorillard argues

that Wirth's personal experience does not qualify him as an expert. Next, sounding a similar

note, Lorillard objects to Wirth's testimony as "a list of foundationless speculation . . . without

any explanation as to how he deduces the pricing structures and business operations for other

companies for which he has never worked." (Pl.'s Mot. at 2.) Finally, Lorillard objects to

Wirth's testimony regarding what would or would not have triggered a "red flag" that the

cigarettes Elston was buying were counterfeit, arguing that this testimony is beyond the scope of

any expertise Wirth may have and is not necessary in order for the finder of fact to draw

conclusions regarding Elston's subjective knowledge.

-3-

## II. Discussion

Preliminary questions concerning the qualifications of an expert witness or the admissibility of evidence are determined by the Court. Fed. R. Ev. 104(a). The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Under Rule 702, expert testimony is admissible if offered by "a witness qualified as an expert by knowledge, skill, experience, training, or education," provided that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Ev. 702. In *Daubert*, the Supreme Court interpreted this rule to require that expert testimony be "not only relevant, but reliable." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (internal quotation marks omitted). As the proponent of Wirth's testimony, Elston has the burden of establishing the admissibility of his testimony by a preponderance of the evidence. *Haager v. Chicago Rail Link, LLC*, 232 F.R.D. 289, 292 (N. D. Ill. 2005).

Lorillard argues that Wirth is not qualified as an expert based on his personal experience. In analyzing the reliability of proposed expert testimony, the Court looks at the qualifications of the expert and the methodology he used to arrive at his conclusions. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999). As indicated by Rule 702, an expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Ev. 702. Although "extensive academic and practical expertise in an area" is the most common way to qualify a potential witness as an expert, *Smith*, 215 F.3d at 718 (internal quotes omitted), the relevant reliability concerns may be satisfied by the witness's personal knowledge and experience. *Kumho*, 526 U.S.

at 150; *see also U. S. v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002) (observing that the Advisory Committee notes to Rule 702 specifically provide that "[i]n certain fields, experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony"). As the Seventh Circuit has stated, "[a]nyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Products, Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). The point is to ensure that an expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.

In addition to the expert's qualifications, the Court's gatekeeping inquiry focuses on the expert's methodology. *Kumho*, 526 U.S. at 153. Rule 702 requires that expert testimony be the result of the expert's reliable application of reliable methods and principles to sufficient facts and data. Fed. R. Ev. 702. The inquiry is "a flexible one" that focuses "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594-95; *see also Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . ."). It is critical, however, that "there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *U.S. v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Finally, even if an expert's testimony is reliable, it must be excluded if it is not likely to help the trier of fact to understand the evidence. Fed. R. Ev. 702. Expert testimony does not assist the trier of fact when a jury is

able to evaluate the same evidence and reach its own conclusions without the introduction of expert testimony. *See Taylor v. Ill. Cent. R.R. Co.*, 8 F.3d 584, 586 (7th Cir. 1993).

In the instant case, the Court finds that Wirth's personal knowledge and practical experience qualify him to testify regarding general customs or practices in the cigarette marketing industry. Wirth's key qualification is his employment history, which includes six years as a Group Product Manager for Southland Corporation and one year as General Sales Manager of Fleming Corporation. At Southland Corporation, the parent company of a convenience store chain, Wirth had "management responsibilities for . . . Core Categories, which included 1.2 billion dollars in cigarette sales." (Def.'s Br. at 3.) At Fleming, Wirth worked directly for a cigarette wholesaler, managing a staff of five to seven salespeople and handling more than 150 accounts. (*Id.* at 3.) In addition to Wirth's direct experience with cigarette wholesaling, Wirth has been working as a retail consultant for the past six years. (Wirth Report at 7.) In light of Wirth's lengthy practical experience and personal observations of the wholesale cigarette industry, the Court concludes that Wirth is qualified to testify about customs and practices in the cigarette marketing industry generally, even though he did not participate in the specific geographic market at issue in this case. *Cf. Abdishi v. Philip Morris*, No 98 C 1310, 1999 WL 756054, at *9 (N. D. Ill. Sept. 7, 1999) (toxicologist was qualified to testify generally about the toxicity of a substance causing irritation to the skin although he did not have any experience dealing with the substance's toxicity in humans); *McCloud ex rel. Hall v. Goodyear Dunlop Tires N. Am., Ltd.*, 479 F. Supp. 2d 882, 887-90 (C. D. Ill. 2007) (allowing an expert in rubber polymers and tire mechanics to testify in a case pertaining to motorcycle tires although he had only limited experience with the manufacture of motorcycle tires). If courts were to require too

exact a match between the personal experience of potential experts and the facts of the cases in which they were to testify, the only available "experts" would be the parties themselves. Rule 702 requires no such limitation.

Wirth's proffered testimony about customs in the wholesale cigarette marketing industry is directly connected to his personal experience. In his report, Wirth points to certain practices, such as giving deep discounts to large-quantity customers or giving other "wholesale allowances" to large-volume buyers, that he claims are common in the cigarette industry. (Wirth Report at 2.) Wirth also states that "fourth tier" cigarette suppliers sometimes sell premium cigarettes at cost and "make up the margin on the fourth tier cigarette and tobacco products that they [sell] as part of their total program." (*Id.*) Finally, Wirth discusses what he claims is a prevailing norm of confidentiality in the industry regarding wholesale allowances and cost information for each supplier. (*Id.* at 3.) All of this testimony stems from his personal experience in the cigarette industry. Therefore, the Court finds Wirth adequately qualified to offer a reliable expert opinion regarding general norms and practices in the cigarette marketing industry.

Finally, Wirth's testimony regarding pricing, discounts, allowances, and confidentiality norms in the cigarette industry embodies the type of "specialized knowledge" that would assist the jury in evaluating a crucial aspect of Lorillard's claim: whether the lower prices Elston paid for the counterfeit cigarettes were unusual enough to raise suspicion that the cigarettes were counterfeit. Although Wirth cannot testify as to Elston's subjective state of mind regarding the difference in price between counterfeit and legitimate Newports, his testimony may help the finder of fact determine whether Elston believed that the discount it received was the result of legitimate business practices or unlawful counterfeiting. *See Olympia Express, Inc. v. Linee*

*Aeree Italiane S.P.A.*, No. 02 C 2858, 2006 WL 293883, at *4 (N. D. Ill. Feb. 3, 2006) (finding

airline expert's custom and practice opinion testimony helpful in determining the nature of the

parties' business relationship).

The Court's finding that Wirth is qualified to provide expert testimony that may be

helpful to the trier of fact is not an endorsement of the substance of his testimony. *Smith*, 215

F.3d at 719. The decision whether an expert is "credible or whether his or her theories are

correct" is a factual determination for the jury to make "after opposing counsel has been provided

the opportunity to cross-examine the expert regarding his conclusions and the facts on which they

are based." *Id.*; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of

contrary evidence, and careful jury instruction . . . are the traditional and appropriate means of

attacking shaky but admissible evidence.") Thus, Lorillard is free to challenge Wirth's opinion

regarding general practices in the cigarette marketing industry with its own evidence or through

cross-examination.

Beyond his testimony regarding customs and practices in the cigarette marketing industry,

the remainder of Wirth's report consists of inadmissible testimony that is neither helpful nor

necessary to assist the finder of fact. For example, one section of Wirth's report discusses

Elston's cigarette purchasing history and the price per carton that Elston was paying for Newport

and other premium cigarettes in 2002 and 2003. (Wirth Report at 5-6.) Wirth is not competent

to testify about Elston's cigarette purchasing history. He has no knowledge of Elston's cigarette

purchases aside from what he has gleaned from documents already disclosed in the case. His

testimony is therefore unnecessary, because his observations about the range of prices paid could

be made by counsel or by the jury based on its own review of the evidence. *See Hoffman v.*

*Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004) (affirming the district court's exclusion of a purported expert's opinion based on a videotape because the jury could view the tape and reach its own conclusions). When the finder of fact can reach the same conclusions without the assistance of an expert, the expert's testimony is not "helpful" and therefore is not admissible.

The Court also rejects Wirth's testimony regarding what would or would not have triggered a "red flag" that the cigarettes Elston was buying were counterfeit. Going beyond the scope of his expertise, which is in the customs and practices of the cigarette marketing industry, Wirth opines that the $2.80 per carton difference in price between the counterfeit and legitimate Newports "was not significant enough to trigger a red flag that the cartons in question were not sold through an intermediate supplier direct from Lorillard the manufacturer." (Wirth Report at 5.) To the extent that this testimony reaches beyond Wirth's knowledge about the cigarette market and makes an assertion about the subjective mental state of Elston and its employees or agents, it is not within the scope of Wirth's expertise, and is certainly not within his personal knowledge. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1993)). Furthermore, the finder of fact is perfectly capable of determining, based on ordinary experience and evidence regarding the nature of Elston's business, whether the price difference could have caused Elston to surmise that the cigarettes were counterfeit. Therefore, Wirth's "red flag" testimony about the subjective effects of a $2.80 per carton price difference is neither based on expertise nor likely to help the finder of fact. Therefore, that testimony is inadmissible and is stricken.

## III. Conclusion

Lorillard's motion to strike the expert report of Frank Wirth is granted in part and denied in part. Based on his personal experience, Wirth may testify regarding general practices and customs in the wholesale cigarette industry. His analysis of Elston's purchase records is stricken because it is not based on his expertise and is not necessary or helpful to the finder of fact. His testimony as to whether a given difference in price would have triggered suspicion on Elston's part that the cigarettes it was purchasing were counterfeit is also stricken because it is not based on expert knowledge and it is not necessary or helpful to the finder of fact.

**ENTER ORDER:**

Dated: May 13, 2008

**MARTIN C. ASHMAN**
United States Magistrate Judge