**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LORILLARD TOBACCO CO., a Delaware corporation, ) ) ) | |
| Plaintiff, ) ) | Case No. 03 C 4753 |
| v. ) ) | Judge Joan B. Gottschall |
| ELSTON SELF SERVICE WHOLESALE ) GROCERIES, INC, an Illinois corporation, et al., ) ) | |
| Defendants. ) | |

## **MEMORANDUM OPINION & ORDER**

Before the court are two motions for partial summary judgment by Defendants Elston Self Service Wholesale Groceries, Inc., Masshour Dukum, Ibrahim Dukum, and David Dukum (collectively Defendants or "Elston"). Elston seeks partial summary judgment on parts of Count VI and Count VIII of the amended complaint.

Count VI is based on the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2 ("Deceptive Practices Act" or "the Act"), and presents two distinct theories—indeed, two separate counts. The first is related to accusations that Elston has sold counterfeit Newport cigarettes in violation of the Act. The second is related to accusations that Elston participated in a cigarette recirculation scheme in violation of the Act. Elston is moving for summary judgment only on the recirculation scheme claim, which is GRANTED.

Count VIII is based on a theory of common-law fraud, and again contains two theories of relief. The first relates to accusations that Elston produced false, inflated invoices to be used by retailers to defraud Lorillard through its promotional programs. The second relates to the sale of recirculated cigarettes, alleging that Elston created a market for recirculated cigarettes and induced

some retailers to defraud Lorillard's promotional programs. Elston is moving for summary judgment only on the recirculation scheme claim, which is DENIED.

Before turning to the merits of these claims, a comment on the parties' pleadings is necessary. Elston's initial brief in support of its motion for partial summary judgment on Count VI mistakenly refers to the Consumer Fraud and Deceptive Business Practices Act ("CFDBPA"), and focused significantly on a question of "consumer nexus" that is relevant only to the CFDBPA, but is not relevant to the Deceptive Practices Act that the complaint actually cites. Still, the brief relied in small part on the Deceptive Practices Act. In its response brief, Lorillard focused exclusively on the mistaken reference to the CFDBPA, and the inapplicability of the "consumer nexus" standard, and did not respond to Elston's other arguments. In its reply, Elston acknowledged its error, but pointed out that it had provided an alternative basis for its motion under the Deceptive Practices Act. Elston also presented additional arguments in its reply that had not been made in its opening brief. Lorillard thereafter sought leave to file a sur-reply, which argues first that Elston's additional arguments are waived, and second, that they should be denied on the merits. Lorillard was given leave to file its sur-reply.

Arguments raised for the first time in a reply brief may be considered waived, *see Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003), but the court will not do so here since both parties have been permitted to fully brief the merits of the issue.

## I. BACKGROUND[1]

Plaintiff Lorillard Tobacco Company ("Lorillard") has brought suit against Elston, pleading eight counts stemming from two general allegations. The first is that Elston sold counterfeit

---

[1] The following facts are taken from the parties' Rule 56.1 statements, and from previous summary judgment orders in this matter. Facts are undisputed unless a dispute is indicated.

cigarettes that improperly carry the Newport mark.  The second is that Elston purchased "recirculated" cigarettes—that is, cigarettes that were sold first from wholesalers to retailers, then from retailers to intermediaries, and next from the intermediaries to Elston, who would then sell the cigarettes to different retailers.  Lorillard alleges that this recirculation scheme violates a promotional program offered by Lorillard, referred to as a "buy-down rebate program."

Elston is a wholesaler of various products, including cigarettes.  Elston does not purchase directly from Lorillard, but purchases from other wholesalers and then re-sells the cigarettes (and other items) to retailers such as gas companies and convenience stores.  Elston is not a "retailer," meaning that Elston does not sell directly to end-user consumers.

Lorillard offers certain retailers a buy-down rebate program.  Programs like this are common throughout the industry.  The program involves an agreement between Lorillard and a retailer.  The retailer typically agrees to display signage and related promotional materials that advertise Lorillard's product, and in exchange the retailer typically receives a rebate on the price paid for the cigarettes, which rebate must be passed on to consumers.  The retailer does not receive a direct financial incentive from Lorillard to participate in this program, but benefits from the program by being able to offer Newport cigarettes at a lower price, resulting in the potential for a larger volume of sales.

Wholesalers like Elston do not participate directly in the buy-down program, and are not a party to buy-down agreements between Lorillard and the retailer.  But wholesalers like Elston provide electronic reporting services to Lorillard regarding their cigarette sales, which Lorillard requires them to do in order for the retailers purchasing from the wholesaler to be able to participate in the buy-down program.

Though the agreement between Lorillard and a retailer requires the retailer to sell the buy-down cigarettes to end-user customers, some retailers do not follow those rules, and instead sell the cigarettes to an intermediary, who sells the cigarettes back to wholesalers such as Elston. This arrangement can potentially be profitable to the retailer, intermediary, and wholesaler, and costly to Lorillard. A hypothetical example is illustrative. If a carton of cigarettes would normally be sold from a wholesaler to a retailer for $40, the rebate program may permit the retailer to receive a $10 rebate from Lorillard, so that the retailer could sell the carton for $30 to an end-user consumer.[2] In this example, the retailer may instead sell the carton to an intermediary for $33, while still collecting the $10 rebate from Lorillard, generating a $3 profit for the retailer. The intermediary may sell the carton to a wholesaler for $36, thereby realizing a $3 profit for itself. The wholesaler could then sell the same carton to a new retailer for $40, realizing a $4 profit. The carton may then be sold to a new retailer as part of the buy-down rebate program, and Lorillard could end up paying a second discount on the same carton.

The parties agree that Elston has at least occasionally purchased from intermediaries cigarettes for which Lorillard had previously paid a rebate. The parties dispute whether Elston was aware that the cigarettes it was purchasing were being "recirculated."

Some facts related to the shelf-life of Newports is also relevant. Newport cigarettes become stale as they age, though neither party discloses when a typical Newport becomes stale. All cartons are encoded with a timestamp from which the carton's age, and approximate freshness, can be calculated, but it is a proprietary code that wholesalers such as Elston are unable to read. Lorillard periodically comes to wholesalers like Elston to inspect their Newport stock, and to ensure that any

---

[2] For simplicity, this hypothetical does not provide for a profit margin for retailers.

cartons deemed too old are removed from the shelves. Elston has possessed stale cigarettes in the past, both of Newports and of other brands.

## II. ANALYSIS

### A. Count VI: Deceptive Practices Act and Recirculation Allegations

The relevant part of Count VI alleges that Elston's

> purchase and resale of cartons of NEWPORT® cigarettes on which Lorillard has already paid a buy-down promotion constitutes a deceptive trade practice in violation of 815 ILCS § 510/2 et seq. insofar as it:
>
>> (i) represents that [Elston's] goods are original, new or fresh when they are in fact deteriorated, altered, reclaimed and secondhand;
>>
>> (ii) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; and
>>
>> (iii) engages in other conduct which similarly creates a likelihood of confusion or misunderstanding.

Am. Compl. ¶ 59. The Deceptive Practices Act. largely tracks the language appearing in the amended complaint, prohibiting a party from doing any of the following in the course of his or her business, vocation, or occupation:

> (6) represent[] that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;
>
> . . . .
>
> (11) make[] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;
>
> (12) engage[] in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 Ill. Comp. Stat. 510/2(a). Elston contends that Lorillard has failed to uncover evidence of any of these basic elements of the Deceptive Practices Act. As the Supreme Court has explained,

> "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

> showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). Elston contends that since insufficient evidence has been adduced by Lorillard, Elston should be granted summary judgment on this part of Count VI.

The first issue to be considered is whether this recirculation process results in the cigarettes becoming stale, such that they are no longer "fresh" when Elston sells them, in violation of the Deceptive Practices Act.[3] Evidence of Elston carrying stale Newport cigarettes is scant, coming solely from admissions by Elston's owner Masshour Dukum that stale cigarettes are sometimes found at Elston. An expert put forth by Lorillard, Michael Pakter, states that this admission by Dukum is a "red flag" indicating possible recirculation activities, because in his view the overturn of product in an urban area such as Chicago generally, and the overturn specifically at Elston, is so high that it is unlikely that cigarettes would sit on shelves long enough to become stale. However, Pakter admits that he is unaware of the normal incidence of staleness for Newports generally, nor whether the incidents of staleness at Elston were unusual when compared to similarly situated businesses.

To prevail, Lorillard would have to show that Elston misled the retailers who purchased from Elston by suggesting that the Newports it was selling were "original or new," even though they were actually "deteriorated' because they were stale. § 2(a)(6). Lorillard points to no evidence that Elston knew that any cigarettes it was selling were stale. The best Lorillard can do is to suggest that

---

[3] Lorillard addresses this issue only in passing in its memorandum of law. *See* Pl. Sur-Reply 3 (Doc. No. 344). Since the matter was raised by Elston in its memorandum, it will be addressed here.

Dukum was aware he was purchasing recirculated cigarettes. Even assuming Dukum knew this, the Deceptive Practices Act claim would fail. The date that appears on cartons of Newport cigarettes is proprietary, such that neither Elston nor the retailers purchasing from Elston can verify the age of the Newports on Elston's shelves. In this context, Elston cannot be found to have misleadingly represented that the Newports being sold are "new" as Elston has no way of ascertaining the age of its product. Furthermore, Elston always purchases Newports from other wholesalers and never purchases directly from Lorillard. Elston has no method of determining how long the Newports it is buying from another wholesaler have been in circulation, just as it has no method of determining how long the Newports it allegedly knowingly recirculated had been in circulation. This age information is controlled by Lorillard, and Lorillard provides no explanation for how Elston could be held responsible for misrepresentations as to freshness.

Lorillard next argues that the Deceptive Practices Act is satisfied because the Act prohibits the misrepresentation that secondhand products are actually new, and Lorillard argues that recirculated cigarettes are inherently secondhand. Lorillard cites to no case law to support this conclusion, but relies on part of the Random House dictionary's definition for the term secondhand, which is defined as, *inter alia*, "previously used or owned." Lorillard argues that since the cigarettes at issue were previously owned by retailers, they were secondhand when they were sold to Elston.

The court's own research reveals no case law interpreting the meaning of secondhand in the Deceptive Practices Act, though other Illinois acts make clear that the term implies that the product in question must reach a *consumer* before obtaining the label "secondhand." *See* 625 Ill. Comp. Stat. 5/1-216 (noting that a motor vehicle becomes "second hand" or "used" only after "it has been placed in a bona fide consumer use," such as for pleasure purposes or for use in a business); 815 Ill.

7

Comp. Stat. 410/1 (defining "second-hand watch" as one which "has previously been sold to a consumer").

Words in a statute are presumed to have their ordinary or natural meaning unless the statute indicates to the contrary. *Smith v. United States*, 508 U.S. 223, 228 (1993). Lorillard's suggested definition suffers from overbreadth; any secondhand product must have been previously owned, but previous ownership cannot automatically confer secondhand status. Nearly every product that goes through any sort of a distribution chain goes through successive ownership, for example, from a manufacturer to any number of intermediate wholesalers to a retailer. Under Lorillard's proposed definition, any product that enters such a distribution chain would automatically become secondhand, which would result in an absurd result. Alternatively, the court could draw a line at the point of retailers, such that a product found in a distribution chain *before* the product reaches a retailer would then be a "new" product, while a product that travels beyond a retailer without going directly to a consumer is a "secondhand" product. Yet this line would be completely arbitrary, as would any attempt to delineate between different points in the distribution chain before the product reaches the end consumer., and Lorillard cites no legal authority for this or any other result. The ordinary meaning of secondhand, for the Deceptive Practices Act as for the other two statutes cited above, requires the product to reach a consumer. Because the cigarettes at issue never reached consumers, Lorillard's secondhand Deceptive Practices Act claim on the issue of recirculation fails.

Lorillard next argues that Elston's method of operation is inherently confusing and deceptive, in violation of § 2(a)(12), since a retailer purchasing from Elston cannot determine whether the cigarettes he is purchasing have come directly from another wholesaler (such as Costco),[4] or come

---

[4] The record has previously established that Elston frequently purchases cigarettes from larger wholesalers, such as Costco, for resale to retailers.

instead from an intermediary and a retailer. Lorillard contends that this practice "inherently creates a likelihood of confusion or misunderstanding as to the source and quality of [Elston]'s inventory of Newport cigarettes." Pl.'s Sur-Reply 4 (Doc. No. 344).

The court cannot agree. The concern over "a likelihood of confusion or misunderstanding" in the Deceptive Practices Act is the same as that in trademark infringement cases. *Rock-A-Bye Baby, Inc. v. Dex Products, Inc.*, 867 F.Supp. 703, 713 (N.D. Ill. 1994). The focus is whether there is a likelihood of confusion over the *origin* of the product. *See Hooker v. Columbia Pictures Indus., Inc.*, 551 F.Supp. 1060, 1065 (D.C. Ill. 1982). In this matter, there is no dispute that the cigarettes being recirculated are genuine Newport cigarettes originating from Lorillard.[5] The only dispute is whether a retailer purchasing from Elston will know whether the product was distributed from, for example, Lorillard to Costco to Elston, or Lorillard to Costco to a retailer to an intermediary to Elston. Lorillard points to no evidence that Elston has any obligation to inform retailers as to where Elston has purchased the cigarettes it is selling, and accordingly, there is no risk of confusion as understood by the Deceptive Practices Act.

Elston's motion for partial summary judgment on the recirculation aspect of Count VI is granted.

**B.    Count VIII: Inducement to Commit Fraud**

Count VIII alleges that Elston "conspired with third parties to recirculate previously 'bought down' cartons of cigarettes by agreeing to purchase previously 'bought down' cigarettes," and that Elston's "actions induced others, including retailers and third parties mentioned in this Complaint, to defraud Lorillard's buydown program by creating a market for 'buydown' cigarettes." Am.

---

[5] Other parts of the complaint allege that counterfeit cigarettes were at issue, but that is not an element of Lorillard's recirculation theory of liability.

Compl. ¶¶ 76–77.  Elston seeks summary judgment on this claim, and raises two arguments.  First, Elston posits that Lorillard's claim is really one sounding in breach of contract, not in tort.  Elston argues that the only parties at fault are the retailers who violated the buy-down agreements between them and Lorillard, agreements to which Elston was not a party.  Elston also argues that even if a fraud claim could be made, the record is insufficient to establish that Elston was a knowing participant in any conspiracy to commit the fraud.

The first argument is erroneous as a matter of law.  It is true that a simple breach of a contract will not support a tort theory of fraud.  *See, e.g.*, *Razdan v. Gen. Motors Corp.*, 979 F.Supp. 755, 758 (N.D. Ill. 1997) ("The mere breach of an employment contract is insufficient to give rise to a claim of constructive fraud.").  This is based on the "economic loss" or *Moorman* doctrine recognized by Illinois courts, whereby obligations arising solely out of a contract are not cognizable as a tort.  *See Golf v. Henderson*, 876 N.E.2d 105, 112–13 (Ill. App. Ct. 2007) (discussing doctrine); *see also Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443 (1982).  However, the economic loss doctrine does not apply where intentional misrepresentations are made.  *Richmond v. Blair*, 488 N.E.2d 563, 567 (Ill. App. Ct. 1985) (citing *Moorman Mfg. Co.*, 435 N.E.2d at 452).  The underlying fraud alleged by Lorillard is committed by retailers, who misrepresent to Lorillard that cigarettes were sold to consumers when they were actually sold to intermediaries.  Though this may constitute a violation of Lorillard's contract with the retailers, it also constitutes an intentional misrepresentation by the retailer—not at the moment the retailer enters into the buydown contract with Lorillard, but when the retailer submits itemized invoices to Lorillard and represents that the cigarettes were sold to consumers.  *See Sorkin v. Blackman, Kellick & Co.*, 540 N.E.2d 990, 1003–04 (Ill. Ap. C. 1989) (noting that fraud requires misrepresentation of existing or past fact, not merely promise to do something in the future).  These intentional misrepresentations by the retailers

take the alleged harm outside of the economic loss doctrine limitation, and a fraud claim is legally viable.

The next question is whether the record supports Elston's contention that there is no evidence a reasonable juror could rely upon to find that Elston participated in a conspiracy to defraud Lorillard. At this stage, all facts, and reasonable inferences from these facts, must be viewed in Lorillard's favor, since it is opposing the motion for summary judgment. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). The parties dispute the implications of two deponents, Mubeen Hussain and Fadi Karam. Drawing all inferences in Lorillard's favor, Hussain states in his deposition that Elston was aware that intermediaries were providing false invoices to Elston to make it appear as though the cigarettes Elston was purchasing were not recirculated, showing that Elston may have had knowledge that it was purchasing recirculated cigarettes. In Karam's deposition, he states that the intermediary businesses he and his family operated purchased cigarettes from retailers and sold them exclusively to Elston, a practice which stopped when Lorillard's investigation into Elston came to public light. One could infer from Karam's deposition testimony, as well, that Elston was aware of a recirculation operation.

Elston argues that even if the above is true, that merely implies that Elston was aware that someone else may have done something improper, but does not speak to Elston's state of mind or participation. This argument is belied by Karam's testimony, when all possible inferences are drawn in Lorillard's favor, as it can be inferred that Karam's recirculation operation sold exclusively to Elston, and stopped the moment Elston stopped purchasing recirculated cigarettes. "A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives . . . is liable as a conspirator."

*McClure v. Owens Corning Fiberglass Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (quotations and citations omitted). As the *McClure* court goes on to explain:

> A conspiracy is almost never susceptible to direct proof. Usually, it must be established from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances. If a civil conspiracy is shown by circumstantial evidence, however, that evidence must be clear and convincing.

*Id.* (citations and quotations omitted). At this stage, Lorillard has met its burden to establish that Elston was providing a market for recirculated cigarettes. Elston's motion for summary judgment on part of Count VIII is denied.

### III. CONCLUSION

Elston's motion for partial summary judgment on the recirculation part of Count VI is GRANTED. Elston's motion for partial summary judgment on Count VIII is DENIED.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: June 9, 2009